## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| SCOTT GERARD GERRY, | CASE NO. 5:21-CV-01115-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Scott Gerry filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI), disability insurance benefits (DIB), and child disability benefits[1] (CDB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On June 2, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry of June 2, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

---

[1]  Child Disability Benefits are available on a parent's earning record if the child can prove disability beginning before attaining age 22. *See* 20 C.F.R. § 404.350.

PROCEDURAL BACKGROUND

Mr. Gerry filed for SSI on May 1, 2019, alleging a disability onset date of August 31, 2018. (Tr. 78, 111). Mr. Gerry filed for DIB on April 16, 2020, and for CDB on April 28, 2020, in both instances alleging a disability onset date of February 28, 2013. (Tr. 94, 102). All of Mr. Gerry's claims were denied initially and on reconsideration. (Tr. 119, 128, 133). He then requested a hearing before an Administrative Law Judge. (Tr. 135-36).

Mr. Gerry (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on October 7, 2020. (Tr. 41-77). On October 30, 2020, the ALJ issued a written decision finding Mr. Gerry not disabled. (Tr. 20-33). The Appeals Council denied Mr. Gerry's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 8-11; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Gerry timely filed this action on June 2, 2021. (ECF #1).

FACTUAL BACKGROUND

I.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Gerry was 21 years old at the time of his alleged onset date in 2013, and 29 years old at the time of the administrative hearing. (Tr. 32, 39). Mr. Gerry completed his GED. (Tr. 54-55). In the past, Mr. Gerry has been employed as a Kitchen Helper and a Prep Cook. (Tr. 31).

II.   RELEVANT MEDICAL EVIDENCE

While in school, Mr. Gerry was on an Individualized Education Plan (IEP) (Tr. 296-371), including accommodations to use a calculator, test in small groups, provide extended assessment time, more time for assignments, and the ability to redo assignments if the concepts were not understood. (Tr. 299, 303). Reports from the 2004-2005 school year indicate Mr. Gerry was

making adequate progress on his IEP goals and objectives, which would be met by the end of the school year. (Tr. 297). The IEP noted Mr. Gerry's strengths in math calculation, reasoning, written expression, and reading comprehension; he was attentive and asked for help when he did not understand a concept, appeared to get along with classmates and teachers, and was polite, cooperative, and personable. (*Id.*).

Treatment records from March 22, 2017 showed mental health diagnoses of generalized anxiety disorder, unspecified depressive disorder, amphetamine-type substance abuse disorder, cannabis use disorder, and other specified personality disorder. (Tr. 375).

Mr. Gerry treated with Ikemefuna Nkanginieme, M.D., at New Horizons Psychiatric Services. (Tr. 472-504). On March 23, 2018, Dr. Nkanginieme noted moderate intensity anxiety, depression, and mood swings, occurring daily. (Tr. 472). Dr. Nkanginieme diagnosed Mr. Gerry with persistent mood (affective) disorders, agoraphobia with panic disorder, generalized anxiety disorder, and attention deficit hyperactivity disorder (ADHD), inattentive type. (Tr. 482). Mr. Gerry had been taking Xanax, Celexa, Adderall, and Lamictal. (Tr. 475). Dr. Nkanginieme found that long-term add-on cognitive behavioral therapy (CBT) was medically necessary for Mr. Gerry's psychologic support and stability. (Tr. 474, 482). Dr. Nkanginieme recommended follow up in four weeks. (Tr. 482).

On April 18, 2019, Dr. Nkanginieme noted Mr. Gerry's chief complaints were anxiety, depression, mood swings, PTSD, and relationship problems. (Tr. 483). Dr. Nkanginieme noted Mr. Gerry was unable to consistently hold down jobs and found Mr. Gerry's social anxiety was a serious issue making him unable to work. (Tr. 483-84). Dr. Nkanginieme noted that Mr. Gerry did not follow up with recommended counseling and only attended once. (Tr. 484). Dr. Nkanginieme

stated that Mr. Gerry required "intensive CBT to address low self-esteem and poor coping skills . . . he doesn't believe he can hold a job – and he won't be able to until his thought patterns adapt positively." (*Id.*). Dr. Nkanginieme recommended monthly and weekly counseling and medication management as medically necessary to maintain homeostasis. (Tr. 484-85). Dr. Nkanginieme noted that Mr. Gerry's mood was anxious and depressed, severe. (Tr. 491). Dr. Nkanginieme continued Mr. Gerry with counseling and medication management, with follow-up in four weeks. (Tr. 493).

Mr. Gerry attended an appointment Dr. Nkanginieme on January 23, 2020, where Dr. Nkanginieme noted severe-intensity symptoms of anxiety, depression, and mood swings affecting Mr. Gerry's functions and activities of daily living. (Tr 494-95). Mr. Gerry was overwhelmed and tearful at this visit due to life changes affecting his parents. (Tr. 495). Mr. Gerry reported that he was not taking his medications, but when he did take them as prescribed, his symptoms were relieved. (*Id.*).

On January 29, 2020, Mr. Gerry underwent an intake assessment at Portage Path Behavioral Health with Michelle Bridgewater, LPCC-S. (Tr 400-09). Mr. Gerry reported depression beginning at age 11 and prior hospitalization for suicide attempts. (Tr. 401). He reported anxiety since childhood and placement on Xanax. (*Id.*). Mr. Gerry reported anger, daily sadness, decreased sleep, fatigue, inattention, nervousness, panic attacks, and poor concentration. (Tr. 400-01). Mr. Gerry reported past instances of trauma and abuse, with intrusive memories, nightmares, flashbacks, hypervigilance, exaggerated startle response, and lack of trust in people. (Tr. 402). Ms. Bridgewater indicated Mr. Gerry was at a medium risk of harm to self in part due to this history; she provided Mr. Gerry with crisis support information. (Tr. 403). Ms. Bridgewater noted impairment in attention and concentration, as well as memory. (Tr. 406). On examination, Mr.

4

Gerry had a labile affect, with depressed and anxious mood, but cooperative behavior; his insight and judgment were fair and thought logical. (*Id.*). No delusions or hallucinations were evident. (*Id.*). Ms. Bridgewater diagnosed Mr. Gerry with generalized anxiety disorder with panic attacks, unspecified bipolar and related disorder, PTSD, and ADHD. (Tr. 408, 410-11).

Mr. Gerry attended an initial appointment with Mark Garretson, PMHNP-BC, on February 4, 2020. (Tr. 412). He had an anxious affect. (Tr. 412). Mr. Gerry reported auditory hallucinations, but no delusions or paranoia, and his sleep was "not great." (Tr. 412). NP Garretson increased Mr. Gerry's Seroquel dosage. (Tr. 412). NP Garretson titrated the Trintellix down over three weeks to discontinue and start Rexulti for treatment resistant depression. (Tr. 413). NP Garretson also noted Mr. Gerry's long-term usage of controlled substances (Adderall and alprazolam) and indicated a need to reduce these medications with the intent to discontinue. (*Id.*). NP Garretson indicated that the status of Mr. Gerry's diagnoses were "stable or improved." (Tr. 414).

On March 27, 2020, due to COVID-19 restrictions, Mr. Gerry attended a follow-up telemedicine appointment with NP Garretson. (Tr. 419-20). Mr. Gerry reported he was "doing pretty well and stable," with no hallucinations, delusions, or paranoia. (Tr. 420). NP Garretson observed appropriate affect. (*Id.*). Judgment and insight were fair, and Mr. Gerry presented with good attention and concentration with minimal distractibility. (Tr. 420-21). NP Garretson again indicated that the status of Mr. Gerry's diagnoses was "stable or improved." (Tr. 421).

On May 5, 2020, Mr. Gerry reported some increased anxiety and sleep issues due to COVID-19. (Tr. 427). Mr. Gerry was compliant with his medication. (Tr. 428). NP Garretson

again indicated at this visit that the status of Mr. Gerry's diagnoses was "stable or improved." (Tr. 428).

At a telemedicine appointment on June 9, 2020, Mr. Gerry reported he was doing okay with no new issues to report. (Tr. 445). Mr. Gerry was compliant with his medication, and NP Garretson indicated Mr. Gerry's diagnoses were "stable or improved." (Tr. 446).

Mr. Gerry treated with NP Garretson on July 10, 2020, where he reported he was stable and doing okay, but also indicated increased anxiety due to COVID-19. (Tr. 452). Examination showed his thoughts contained obsessions, but thought content was normal and intact. (*Id.*). NP Garretson again indicated Mr. Gerry's diagnoses were "stable or improved." (Tr. 453).

In a follow-up telemedicine appointment on July 29, 2020, Mr. Gerry reported he was stable and doing okay, and that his diet and sleep were okay, with no new issues to report. (Tr. 459). NP Garretson refilled Mr. Gerry's prescription for alprazolam and recommended follow-up in one month. (*Id.*). NP Garretson again indicated Mr. Gerry's diagnoses were "stable or improved." (Tr. 460).

On September 8, 2020, Mr. Gerry again reported he was stable and doing okay, no new issues, and his diet and sleep were okay. (Tr. 466). NP Garretson recommended follow up in two months. (*Id.*). NP Garretson indicated Mr. Gerry was stable. (Tr. 470).

## III.  MEDICAL OPINIONS

Mr. Gerry underwent a psychological consultative examination on July 31, 2019 with Bryan Krabbe, Psy.D. (Tr. 389-95). Dr. Krabbe noted chief complaints including ADHD, anxiety, bipolar disorder, major depressive disorder, agoraphobia, and a learning disability. (Tr. 389). Mr. Gerry's prescriptions included alprazolam, Adderall, Trintellix, and quetiapine. (Tr. 390).

Mr. Gerry reported having ten to fifteen jobs in his life with "off and on employment" and the longest period of employment being two months at a sandwich shop. (Tr. 391). He reported not getting along with supervisors and coworkers, and difficulties with focus and performing tasks in a timely manner, and managing stress at work. (*Id.*).

Dr. Krabbe noted that Mr. Gerry's description of his PTSD symptoms could compromise his ability to respond to work pressures, leading to increased likelihood of agitation. (Tr. 395). Similarly, Mr. Gerry's symptoms of his depression may compromise his ability to respond to work pressures leading to increased emotional instability and withdrawal. (*Id.*). Dr. Krabbe indicated Mr. Gerry performed adequately in his functional assessments regarding understanding instructions and short-term memory, but was below average on remembering instructions. (Tr. 394). Mr. Gerry also demonstrated difficulty maintaining attention, focus, and concentration, but showed adequate task persistence when answering questions. (*Id.*). Dr. Krabbe assessed that Mr. Gerry operates within adequate limits of intellectual functioning to understand and respond to supervisor feedback and adequately relate to coworkers. (*Id.*).

State agency medical consultants reviewed Mr. Gerry's record at the initial and reconsideration levels. On August 15, 2019, state agency reviewing psychologist Paul Tangeman, Ph.D., reviewed Mr. Gerry's record at the initial level. (Tr. 84-90). Dr. Tangeman found that Mr. Gerry was mildly limited in his ability to understand, remember, or apply information, and in interacting with others; but moderately limited in his ability to concentrate, persist, or maintain pace, and in his ability to adapt or manage himself. (Tr. 84-85). Dr. Tangeman found Mr. Gerry was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without

7

interruptions from psychologically based symptoms and to perform at a consistent pace. (Tr. 87). In Dr. Tangeman's opinion, Mr. Gerry was capable of maintaining attention, concentration, persistence and pace for simple routine tasks. (*Id.*). Mr. Gerry was found not disabled. (Tr. 89).

On May 7, 2020, State agency reviewing psychologist Vicki Warren, Ph.D., affirmed Dr. Tangeman's findings. (Tr. 97-100).

Dr. Nkanginieme completed a Mental Impairment Questionnaire on September 25, 2019. (Tr. 386-87). Dr. Nkanginieme noted Mr. Gerry was diagnosed with ADHD, agoraphobia with panic disorder, and major depressive disorder, for which he was prescribed dextroamphetamine, alprazolam, Seroquel XR, Trintellix, and Rexulti. (Tr. 386). Dr. Nkanginieme noted clinical findings of "excessive agoraphobia with panic attacks" and a "disabling" prognosis for Mr. Gerry. (*Id.*). Dr. Nkanginieme opined Mr. Gerry had no useful ability to function or was unable to meet competitive standards in all but two areas of mental work-related functioning, within the broad categories of sustained concentration and persistence, understanding and memory, social interaction, and adaptation. (Tr. 386-87). Dr. Nkanginieme indicated Mr. Gerry was seriously limited in his ability to remember locations and work-like procedures and in understanding and remembering very short and simple instructions. (Tr. 387). Dr. Nkanginieme also opined that Mr. Gerry would miss four days of work per week and would be off-task 90% of the workday. (*Id.*).

In a letter dated July 3, 2019, NP Garretson, on behalf of New Horizons General Psychiatry and Counseling Services, indicated that Mr. Gerry has "significant disabilities related to mental health conditions that impact his ability to work and function in a normal fashion." (Tr. 385).

NP Garretson also completed a Mental Impairment Questionnaire on August 12, 2020. (Tr. 438-39). NP Garretson indicated Mr. Gerry "has suffered from debilitating anxiety and depression for many years" and had a "poor" prognosis. (Tr. 438). NP Garretson opined that Mr. Gerry was limited but satisfactory in his ability to carry out very short and simple instructions. (Tr. 438). NP Garretson indicated Mr. Gerry was seriously limited but not precluded from carrying out detailed instructions, performing activities within a schedule, managing regular attendance and punctuality, remembering locations and work-like procedures, understanding and remembering very short and simple instructions, interacting with the general public, asking questions, getting along with coworkers or peers, maintaining socially appropriate behavior, responding appropriately to changes in the work setting, and being aware of normal hazards and taking appropriate precautions. (Tr. 438-39). NP Garretson further opined that Mr. Gerry was unable to meet competitive standards in maintaining attention/concentration for extended periods, sustaining an ordinary routine without special supervision, working in coordination with or near others without distraction, completing a normal workday without interruption from psychological symptoms, and performing at a consistent pace, understanding and remembering detailed instructions, setting realistic goals, and accepting instructions and responding appropriate to supervision. (Tr. 438-39). NP Garretson opined that Mr. Gerry would miss 15 days of work per month and would be off-task 90% of the workday. (Tr. 439).

### III.   ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Gerry and VE Brian Womer, presented during the hearing before the ALJ.

Mr. Gerry testified he lives in a duplex with his significant other, but he does not often leave the house due to his agoraphobia. (Tr. 52). He does not drive and has his mother or significant other take him to appointments. (*Id.*). However, because most of his visits were provided via telehealth, Mr. Gerry had not left the house for two or three weeks. (Tr. 52-53). He is generally home alone during the day, unless his mother or father visits him; he has no regular interaction with his neighbor on the other side of the duplex. (Tr. 53). He has no friends to speak of. (Tr. 54).

Mr. Gerry did not finish high school, but later completed his GED. (*Id.*). He dropped out of high school his freshman year because it was hard for him to concentrate, despite having an IEP. (*Id.*). He could not handle being around other people and became overwhelmed. (*Id.*). It took Mr. Gerry three attempts to complete his GED due to concentration issues stemming from his ADHD. (Tr. 54-55).

Mr. Gerry last worked in 2018 in a food service position washing dishes. (Tr. 55-56). The company tried to train Mr. Gerry to work on the line but he was unable to do so. (Tr. 56). The hours were variable up to full-time work, but Mr. Gerry often left early due to becoming overwhelmed by interacting with his coworkers. (Tr. 55-56). He was required to lift up to twenty pounds. (Tr. 56-57). Mr. Gerry held this job for three months. (Tr. 55).

Mr. Gerry also worked for two months at a sandwich shop doing prep work and washing tables. (Tr. 56). In 2012, he worked for a fast-food restaurant for two months. (Tr. 57). In the fast-

food restaurant, he was on the line, but found this work too fast paced. (*Id.*). He was then placed on the cash register, but found it difficult to work with customers due to his bipolar disorder. (*Id.*). He was removed from both of these positions and placed in the back washing dishes but quit shortly after. (Tr. 57-58).

Mr. Gerry testified that staying on task, getting along with others, and understanding instructions prevented him from working. (Tr. 60-61). He has diagnoses including agoraphobia, major depressive disorder, ADHD, bipolar disorder, and "extreme anxiety." (Tr. 61). He takes Rexulti, tranphilix,[2] Seroquel, Adderall, and Xanax, and does not miss any doses of these medications. (*Id.*). Mr. Gerry also receives individual counseling. (Tr. 62). Mr. Gerry's agoraphobia makes it difficult for him to leave his home to work. (Tr. 66-67). He sometimes has bursts of anger with customers and supervisors. (Tr. 63). He often will "snap" and have an outburst with his significant other or family members. (*Id.*). These outbursts occur even when Mr. Gerry is compliant with his medication. (*Id.*). Mr. Gerry also has problems with concentration, a racing mind, and anxiety. (Tr. 64-65). Mr. Gerry avoids stressful situations as much as possible; for example, he would quit after being reprimanded at work. (Tr. 66).

The VE then testified. VE Womer described Mr. Gerry's past relevant work as a dishwasher or kitchen helper, DOT 318.687-010, unskilled, SVP 2, medium per the DOT, light as performed. (Tr. 69). His work as a prep cook was DOT 317.687-010, unskilled, SVP 2, medium per the DOT, light as performed. (Tr. 70). Finally, his fast-food worker position was classified as DOT 311.472-010, unskilled, light per the DOT and as performed. (*Id.*).

---

[2]    As reported in the administrative hearing transcript, with the notation "(phonetic)". (Tr. 61). It is unclear what medication Mr. Gerry was describing.

The ALJ then presented hypotheticals to the VE, considering an individual of Mr. Gerry's age, education, and vocational background. (*Id.*). The first hypothetical individual had non-exertional limitations only; could perform simple, routine, and repetitive tasks, but could not perform tasks at a high production rate pace, such as assembly line work; he could interact on an occasional basis with supervisors and a small group of familiar coworkers, with no more than incidental interaction with the general public; the individual was also further limited to superficial contact, meaning no sales, arbitration, negotiation, conflict resolution, or confrontation; no group, tandem, or collaborative tasks, and no management, direction, or persuasion of others; the individual could respond appropriately to occasional change in a routine and relatively static work setting but any such changes would need to be easily explained and/or demonstrated in advance of gradual implementation. (Tr. 70-71).

The VE responded that, considering those restrictions, Mr. Gerry's past work as a dishwasher or kitchen helper and prep cook positions could still be done as classified and as performed. (Tr. 71). However, VE Womer would eliminate the fast-food worker position based on the limitations set forth regarding interaction with the public. (*Id.*). VE Womer testified that there are entry-level unskilled jobs at all exertional levels in the national economy that a hypothetical individual so restricted could perform. (*Id.*). Representative examples of medium SVP 2 jobs included laundry worker, DOT 361.685-018, 370,000 jobs in the national economy; warehouse worker, DOT 922.687-058, 740,000 jobs in the national economy; and industrial cleaner, DOT 381.687-018, 230,000 jobs in the national economy. (Tr. 71-72).

The ALJ then presented a hypothetical individual with the same restrictions, but reduced social interaction to occasional interaction with supervisors but otherwise would have to work in

isolation, meaning no interaction or contact with either coworkers or the general public. (Tr. 72). The VE testified that all past work would be eliminated, as well as the other jobs listed in the first hypothetical. (*Id.*). The VE explained the restriction to work in isolation from coworkers was work-preclusive. (*Id.*).

The VE testified that an individual who is off task more than ten percent of the time cannot sustain full-time, entry-level, unskilled work. (Tr. 73). Similarly, an employee missing more than one day per month would not be able to keep a full-time, entry-level, unskilled job. (*Id.*). Leaving a couple hours early or arriving late would be viewed the same as an absence. (*Id.*).

Mr. Gerry's attorney asked the VE a hypothetical regarding an individual who would require additional supervision such that they would need reminders for retraining or staying on task; such an individual would need additional supervision at least once per hour on an ongoing basis. (Tr. 74). The VE responded that hypothetical would preclude competitive work. (*Id.*). Entry-level, unskilled work is tolerant of a supervisor redirecting an employee two to four times per day, or once every two hours, but would not be tolerant of redirecting on an hourly basis. (*Id.*).

The ALJ kept the record open for thirty days to obtain additional records from Mr. Gerry's providers. (Tr. 75-77).

## THE ALJ'S DECISION

The ALJ's decision, dated October 30, 2020, included the following findings of fact and conclusions of law:

1.   Born on March 13, 1991, the claimant had not attained age 22 as of February 28, 2013, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

13

3. The claimant has not engaged in substantial gainful activity since February 28, 2013, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

4. The claimant has the following severe impairments: bipolar disorder, depressive disorder, mood disorder, anxiety disorder and agoraphobia with panic attacks, personality disorder, post-traumatic stress disorder (PTSD), attention-deficit hyperactivity disorder (ADHD), and substance abuse disorder (20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine, and repetitive tasks, but cannot perform tasks that require a high production rate pace, such as assembly line work. He can interact on an occasional basis with supervisors and a small group of familiar coworkers, with no more than incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others. The claimant can respond appropriately to occasional change in a routine and relatively static work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

7. At all times relevant to this decision, the claimant has been capable of performing past relevant work as a Kitchen Helper, DOT No. 318.687-010, an unskilled job at the medium exertional level, performed by the claimant at the light exertional level; and Prep Cook, DOT No. 317.687-010, an unskilled job at the medium exertional level, performed by the claimant at the light exertional level. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

8. The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2013, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(f) and 416.920(f)).

14

(Tr. 26-33).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial

15

evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters,* 127 F.3d at 529.

### DISCUSSION

Mr. Gerry argues substantial evidence does not support the ALJ's RFC determination because the ALJ failed to assess the opinion evidence from Dr. Nkanginieme and NP Garretson.[3] (Pl.'s Br., ECF #11, PageID 577). Specifically, Mr. Gerry asserts that substantial evidence is lacking because the treatment notes the ALJ referenced in his decision were primarily from telemedicine

---

[3]      Mr. Gerry also makes passing reference to meeting Listing criteria based on the limitations opined by Dr. Nkanginieme and NP Garretson. (Pl.'s Br., ECF #11, PageID 583; Pl.'s Reply Br., ECF #16, PageID 623). However, Mr. Gerry does not indicate which Listing he meets, nor does he "point to specific evidence that demonstrates [he] reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014). I therefore decline to review this issue. *See Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 491 (6th Cir. 2006) ("we decline to formulate arguments on Hollon's behalf. . . . Rather, we limit our consideration to the particular points that Hollon appears to raise in her brief on appeal").

visits that are not reflective of Mr. Gerry's functional abilities outside of his home. (*Id.* at PageID 577, 579). In short, Mr. Gerry asserts the evidence supports a finding of disability. (*Id.* at 579-84).

The Commissioner opposes, pointing to the same treatment records to show that substantial evidence supports the ALJ's RFC finding and that the ALJ adequately evaluated the opinion evidence against the medical record. (Comm'r's Br., ECF #14, PageID 606-11). In the Commissioner's view, Mr. Gerry's argument amounts to a request to re-weigh the evidence in his favor, which this Court may not do. (*Id.* at PageID 611).

For the reasons that follow, I agree with the Commissioner; the ALJ explained the reasons for not finding the opinions of Dr. Nkanginieme and NP Garretson persuasive in accordance with the regulations. Substantial evidence supports the ALJ's findings, and for me to find otherwise would amount to a re-weighing of the evidence.

## I.     Off-task and absenteeism opinions are not *per se* an issue reserved to the Commissioner.

As a threshold matter, the Commissioner argues that the off-task and absenteeism responses contained in the opinions of Dr. Nkanginieme and NP Garretson are "tantamount to a finding of disability" and not requiring explanation, as an issue reserved to the Commissioner. (Comm'r's Br., ECF #14, PageID 609-10 (collecting cases)). Mr. Gerry replies that doctors are permitted to make reasoned judgments about the effects of a disease, up to and including how the impairment might affect off-task and absenteeism behaviors. (Pl.'s Br., ECF #16, PageID 621-22 (citing, *e.g.*, *Sharp v. Barnhart*, 152 F. App'x 503, 510 (6th Cir. 2005), and *Vaughn v. Comm'r of Soc. Sec.*, 5:20-cv-02868, 2022 WL 1089256, at *11-12 (N.D. Ohio Apr. 11, 2022), *report and recommendation adopted*, 2022 WL 1092118 (N.D. Ohio Apr. 12, 2022)).

I agree with Mr. Gerry that the off-task and absenteeism questions Dr. Nkanginieme and NP Garretson answered were not *per se* statements regarding the ultimate question of Mr. Gerry's disability. *See Sharp v. Barnhart*, 152 F. App'x 503, 510 (6th Cir. 2005) ("Nor are we aware of any regulatory or case support for the third explanation given by the ALJ—that "the issue of disability based upon frequent absenteeism . . . remains an issue reserved to the Commissioner."). Social Security regulations provide that statements regarding to whether a claimant is disabled intrude on an issue reserved to the Commissioner and thus are "inherently neither valuable nor persuasive." 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3). Some cases in this District have agreed that opinions as to absenteeism are "tantamount to a disability finding." *Littleton v. Comm'r of Soc. Sec.*, No. 5:12 CV 2756, 2013 WL 6090816, at *11 (N.D. Ohio Nov. 19, 2013); *see also, e.g., Saulic v. Colvin*, No. 5:12CV2753, 2013 WL 5234243, at *8 (N.D. Ohio Sept. 16, 2013); *Chhay v. Colvin*, No. 1:13-CV-02229, 2014 WL 4662024, at *8 (N.D. Ohio Sept. 17, 2014). However, those cases also indicate "those opinions should not be ignored" and direct that the ALJ must still explain why the opinion was not followed. *Littleton*, 2013 WL 6090816, at *11; *Saulic*, 2013 WL 5234243, at *8 ("opinions from any medical source on issues reserved to the Commissioner must never be ignored."). Those cases also acknowledge that opinions regarding a claimant's absenteeism may still be considered a medical opinion when "not the product of conjecture." *Chhay*, 2014 WL 4662024, at *8 n.7.

I am thus not persuaded by the Commissioner's argument that the ALJ is not required to analyze the opinions provided by Dr. Nkanginieme and NP Garretson. The record reflects that both Dr. Nkanginieme and NP Garretson were Mr. Gerry's treatment providers during the relevant time periods. Both providers also indicate that their assessment of the severity of Mr.

Gerry's symptoms are based on clinical findings. (Tr. 397, 438). If the ALJ determines Dr. Nkanginieme and NP Garretson's opinions are persuasive, Mr. Gerry could be precluded from competitive work and thus determined disabled. But the record and the applicable caselaw does not support a finding that the medical opinions are "tantamount to a finding of disability" or that the ALJ was not required to explain his reasoning under the regulations. I therefore turn to the ALJ's consideration of these opinions when crafting the RFC.

## II.     The ALJ properly explained the medical opinions pursuant to 20 C.F.R. §§ 404.1520c(a) and 416.920c(a).

At issue here is the ALJ's evaluation of the medical opinion evidence when forming the RFC. Because Mr. Gerry filed his application after March 27, 2017, his case is evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.920c. Under these regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at §§ 404.1520c(b), 416.920c(b).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at §§ 404.1520c(a), 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[4] and consistency.[5] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ

---

[4]     "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1).

must explain how the ALJ considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2), (3), 416.920c(b)(2), (3). The ALJ is required to say enough in the decision to allow this Court to trace the path of reasoning. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

An ALJ can rely on opinion evidence in the record when forming the RFC. The RFC is what an individual can still do despite his limitations. SSR 96-8p. It is an administrative assessment of the extent to which an individual's impairments and related symptoms may cause limitations or restrictions that affect his capacity to do work-related activities. *Id*. An ALJ's RFC assessment must be based on all relevant evidence in the record and must include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 744 F. Supp. 2d at 881.

Here, the ALJ determined Mr. Gerry had the following RFC:

I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine, and repetitive tasks, but cannot perform tasks that require a high production rate pace, such as assembly line work. He can interact on an occasional basis with supervisors and a small group of familiar

---

5       "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2).

coworkers, with no more than incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others. The claimant can respond appropriately to occasional change in a routine and relatively static work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

(Tr. 27-28). In making this finding, the ALJ considered the medical opinion evidence provided by

Dr. Nkanginieme and NP Garretson. The ALJ discounted their opinions, stating:

> Mr. Garretson has opined that the claimant has significant disabilities that impact his ability to work and function in a normal fashion (4F/1). In August of 2020, the claimant filled out a form opining that the claimant would be unable to meet competitive standards in sustaining concentration and persistence, would be seriously limited in social interaction, and have serious difficulties with adaptation. Mr. Garretson further opined that the claimant would miss 15 days of work per month, and would be off-task 90% of the workday (9F/1-2). Dr. Nkanginieme filled out the same form in September of 2019, and had similar, if even more extreme findings (4F/2-3, duplicated at 7F). Specifically, Dr. Nkanginieme opined that the claimant would have no useful ability to function in the domains of social interaction or adaptation (4F/3). I do not find these opinions persuasive, as they are not supported by either Mr. Garretson's or Dr. Nkanginieme's own treatment record. Although he has noted the presence of mild depression and anxiety, Mr. Garretson's treatment notes reflect a stable individual with no difficulty with memory or concentration, a logical thought process, and consistent affect. Dr. Nkanginieme has made similar findings (11F/8-10). Moreover, the claimant's mental status examinations have been fairly unremarkable, particularly in the past year when he was taking his psychotropic medication. Therefore, I do not find these rather extreme limitations persuasive, as they are unsupported by the medical treatment record.

(Tr. 31).

As he explains above, the ALJ determined the limitations of these two opinions not supported by the respective providers' own treatment records. The ALJ further noted Mr. Gerry's diagnoses of "depression and anxiety" but also that NP Garretson's treatment notes reflected "a stable individual with no difficulty with memory or concentration, a logical thought process, and consistent affect" and similar findings by Dr. Nkanginieme. (Tr. 31). The ALJ also noted

"unremarkable" mental status findings, particularly when Mr. Gerry was taking his medication as prescribed during the last year available at the record. (*Id.*). For these articulated reasons, the ALJ found the opinions of Dr. Nkanginieme and NP Garretson unpersuasive.

But it is not necessary to confine review to this single paragraph; the ALJ's decision is read "as a whole and with common sense." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010); *accord Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Elsewhere in the decision, the ALJ considered the treatment notes of Dr. Nkanginieme and NP Garretson, stating:

> These conditions [affective disorder, persistent mood disorder, agoraphobia with panic disorder, generalized anxiety disorder, and ADHD] were being treated with a regimen of psychotropic medications. In March of 2018, the claimant told Ikemefuma [*sic*] Nkanginieme, M.D., that he had recently been made the manager at the sandwich shop at which he was working, He indicated that he was happy about this advancement, but that it was also stressful (11F/2). Dr. Nkanginieme noted that the claimant did appear depressed and anxious, but was rational and cooperative (11F/8-10). At the claimant's next psychiatric follow-up in April of 2019, the claimant was no longer working, and told Dr. Nkanginieme that he did not believe that he could hold down a job, and that he had not gone to counseling, as recommended. At his next visit with Dr. Nkanginieme in January of 2020, the claimant had not been taking his medication, despite his admission that was able to find relief from his symptoms when compliant. At that time, he presented as tearful, and expressed concern over the poor medical condition of his parents (11F/24). There is no further record of any visits to Dr. Nkanginieme.

(Tr. 29). The ALJ further described NP Garretson's treatment notes, as follows:

> The claimant began counseling with Mark Garretson, PMHNP-BC, in February of 2020. Mr. Garretson added ADHD to the claimant's diagnoses, and started him on a new psychotropic medication regimen. He noted that the claimant showed signs of only mild depression and anxiety, and had no difficulty with memory or concentration, (8F/13-15). Since March of 2020, the claimant has made regular tele-health counseling visits due the COVID-19 epidemic. During these visits, the claimant had unremarkable mental status exams, and his symptoms were generally described as "stable or improved" (e.g.,10F/5-6). In the most recent available treatment notes from September of 2020, the claimant reported that he was "doing ok" and had no new issues. His mental status exam at that time was unremarkable,

with an appropriate affect, no difficulty with concentration, and intact memory (10F/26-27)

From the above, the claimant has some limitations related to his various mental health conditions. The mental health treatment record shows that he often presented with depression and anxiety, and he appeared very nervous when testifying. However, he has had conservative mental health treatment, and has often been non-compliant with his medication and counseling, indicating that his symptoms are not as severe as alleged. Moreover, his mental status examinations have been fairly unremarkable, particularly in the past year when he was taking his psychotropic medication. Nonetheless, I have attempted to accommodate his remaining symptoms by limiting the claimant to the type of simple work and limited interactions described in the residual functional capacity.

(Tr. 30).

Reviewing the decision as a whole makes clear that the ALJ considered the factors of "supportability" and "consistency" as the regulations require. Dr. Nkanginieme opined, in part, that Mr. Gerry would be absent from work four days per week due to his mental health impairments, and would be off-task ninety percent of the time due to his symptoms. (Tr. 398). He further opined that Mr. Gerry had "no useful ability to function" in a regular work setting in nearly every category assessed. (Tr. 397-98). NP Garretson's opinion similarly found Mr. Gerry would miss fifteen days of work per month, and would be off-task ninety percent of the time due to his symptoms. (Tr. 439). After comparing these opinions with their own treatment notes, the ALJ found that Mr. Gerry's symptoms were "not as severe as alleged" and that he positively responded to medication management when compliant with the regime, and informed NP Garretson that he was "doing okay" in the period prior to the hearing. (Tr. 30). Although the ALJ did not limit Mr. Gerry as severely as his providers, the ALJ did consider Mr. Gerry's mental health impairments when crafting the RFC, and included restrictions such as simple work and limited interaction with only occasional interaction with supervisors and "a small group of familiar

coworkers" and "incidental interaction" with the public. (Tr. 27-28, 30). I see no error with the RFC or the ALJ's explanation of his reasoning.

Mr. Gerry also attempts to argue that the ALJ did not properly consider additional factors, such as whether the visits were via telemedicine (*e.g.*, Pl.'s Reply Br., ECF #16, PageID 623), or the reasons for Mr. Gerry's periodic medication noncompliance (*e.g.*, Pl.'s Br., ECF #11, PageID 582). This argument is not well-taken. First, the ALJ is not required to explain those factors under the regulations, although they must be considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *see also* SSR 16-3p. Symptoms of a mental health impairment may be a good reason for a claimant's noncompliance with prescribed treatment. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009). But for this to serve as substantial evidence, the record must show that the noncompliance results from mental health symptomology. *Id.* at 283-84 ("We recognize that ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state. . . . But in this case there is no evidence in the record explaining White's failure to seek treatment . . .").

Further, SSR 16-3p requires the ALJ to "consider and address reasons for not pursuing treatment that are pertinent to an individual's case." That regulation states, "if the individual fails to follow prescribed treatment that might improve symptoms, [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. [The ALJ] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p.

Even so, the ALJ was conscious of the fact that the visits with NP Garretson were conducted via telemedicine, and states as much in his discussion of the treatment notes. (Tr. 30). Although not required to explain the reasoning, the ALJ references Mr. Gerry's intermittent noncompliance with his medication and his failure to follow through with recommended counseling. (Tr. 29). However, the ALJ references this in the context of the benefits Mr. Gerry admitted he receives when compliant with his medication and when attending appointments regularly. (*Compare* Tr. 495 *with* Tr. 29-30). The ALJ also indicates Mr. Gerry appeared to be "doing ok" by his own admission during the period of medication and treatment compliance with NP Garretson, and that NP Garretson indicated that Mr. Gerry was "stable or improved." (Tr. 30). Although telemedicine may not paint as detailed a picture as an in-person office visit might, and Mr. Gerry's periods of medication noncompliance may result from his mental health conditions, the ALJ properly indicated his reasoning in the decision. I find no sufficient basis requiring remand.

An ALJ's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This is true even if substantial evidence also exists in the record on which the ALJ could have found the claimant disabled. *Id.* Despite contrary opinions from Mr. Gerry's treatment providers, I find the ALJ's explanations are adequate to support the RFC and substantial evidence supports his findings. I therefore recommend the District Court affirm.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits, supplemental security income, and child disability benefits.

Dated: July 13, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl,* 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.,* 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).

27